CONNELLY
LAW OFFICES

Colin G. Prince
John B. McEntire, IV
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100
*Attorneys for Plaintiff*
*Pro Hac Vice* Applications Pending

Davina Chen
Law Offices of Davina Chen
1751 Colorado Blvd. No. 190
Los Angeles, California 90041
213.446.8791

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.M., | No. |
| Plaintiff, | Complaint |
| v. | Jury Trial Demanded |
| United States of America; Atwater Does 1–2, individually; Mendota Does 1–5, individually; | |
| Defendants. | |

TABLE OF CONTENTS

Introduction ......................................................................................................................3

I.    Jurisdiction and Venue......................................................................................5

II.   Parties ...............................................................................................................6

III.  Facts..................................................................................................................7

      A.    USP Big Sandy, Kentucky ......................................................................7

            1.    BOP's associate warden and guards institute an "unofficial policy" of torture and assault..............................................................7

            2.    BOP employees destroy evidence of the staff assaults...............10

            3.    BOP guards assault and torture JM.............................................11

            4.    DOJ successfully covers up the USP Big Sandy conspiracy. ......13

      B.    USP Thomson, Illinois ..........................................................................15

            1.    BOP staff bar JM from filing grievances. ...................................15

            2.    BOP staff retaliate against JM and kill his cellmate. .................16

      C.    USP Atwater, California ........................................................................19

            1.    Officer Munagay attacks JM. ......................................................19

            2.    Officers violently assault JM by shoving a blunt object into his anus. .......21

            3.    BOP staff attempt to cover up the sexual assault......................21

            4.    BOP staff conspire to fabricate false incident reports and charge JM with assault and threats...................................................25

      D.    FCI Mendota, California.........................................................................26

            1.    BOP staff torture JM..................................................................26

            2.    BOP staff prevent JM from filing administrative grievances. ....29

            3.    JM is exonerated of wrongdoing. ...............................................34

      E.    Aftermath...............................................................................................37

            1.    Officer Munagay is prosecuted. .................................................37

            2.    BOP ignores JM's FOIA request..............................................38

            3.    JM is left with profound damages. .............................................39

Complaint                          – 1 –                          Connelly Law Offices
                                                                  321 W. 8th Avenue
                                                                  Spokane, Washington 99204
                                                                  253.593.5100

IV.    Claims ..................................................................................................................39

    A.    First Claim: Assault and Battery ................................................................ 40

    B.    Second Claim: Sexual Assault and Sexual Battery................................. 40

    C.    Third Claim: Intentional Infliction of Emotional Distress.....................41

    D.    Fourth Claim: False Imprisonment ........................................................ 42

    E.    Fifth Claim: Sexual Harassment .............................................................. 42

    F.    Sixth Claim: Intentional Interference with Civil Rights by Threats, Intimidation, or Coercion ..........................................................................................43

    G.    Seventh Claim: Invasion of Privacy ........................................................ 44

    H.    Eighth Claim: Negligence ........................................................................ 44

    I.    Ninth Claim: Malicious Prosecution........................................................46

    J.    Tenth Claim: Cruel and Unusual Punishment and Deliberate Indifference to Medical Treatment .............................................................................47

V.    Jury Demand ......................................................................................................... 48

VI.    Relief Requested ................................................................................................... 48

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**INTRODUCTION**

On November 2, 2023, JM was a federal inmate at USP Atwater out on his rec-time when Defendant Sandra Munagay, a guard, demanded he turn over his straw sunhat. Although the hat was a BOP-approved, commissary-purchased hat, JM turned it over. Later that afternoon, when JM asked for the hat's return, Munagay lost control. She punched JM in the face, then along with her partner, Officer Rupe, handcuffed JM and threatened to pepper-spray him. JM did not fight back—he never laid a hand on Munagay or anyone else.

The control room, monitoring the unit video feed, saw the commotion and ordered a response team. When that team of BOP officers arrived, Munagay needed an explanation for her conduct. So she lied, telling other officers JM had attacked her. Officer Rupe backed her up.

To teach JM a lesson, at least three guards dragged him from the unit to the hallway where they knew a gap in the surveillance cameras existed. There, pinning JM face-first into the wall, they sexually assaulted him, ramming a blunt object into his anus through his clothes until he bled.

The cover up started immediately. BOP staff falsely claimed he had no injuries and refused to perform any real medical exam. Sitting in the medical unit, JM—a survivor of numerous violent BOP institutions—knew the exam was being recorded and had the foresight to announce he had been sexually assaulted. With the accusation recorded, BOP was forced to transfer JM to another prison that evening, FCI Mendota, and then to an emergency room that night. Medical records prove the sexual assault: JM was bleeding in his rectum.

Retaliation was swift—BOP staff threatened and tortured JM. Over the next six months, JM was kept in solitary confinement and repeatedly "four pointed"—lashed to a concrete slab in isolation for 20 hours or more without food, water, or a toilet, forced to urinate and defecate on himself. Officers told other inmates JM was a "rat" in efforts to provoke an attack. He was called racial epithets. "We gonna make sure you get stabbed."

Complaint                                    – 3 –                    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

JM, alone and desperate to report what has happening, tried to file administrative grievances. As was the case at all his prior institutions, BOP staff made sure that was impossible. They threatened him, destroyed his legal paperwork, refused to provide forms or copies, all to ensure the courts were inaccessible and their own crimes would go unpunished.

JM tried to kill himself repeatedly.

The perpetrators of these crimes, all BOP employees, then conspired to fabricate false incident reports—lying for each other—and administratively charged JM with assault. In other words, an internal prison prosecution.

JM had one stroke of luck. As he was enduring these events, BOP was under intense scrutiny due to the calamity at a nearby women's prison two hours away, FCI Dublin, where dozens of women had been raped and sexually abused for years by BOP staff, including the warden, the chaplain, and numerous guards. Prosecutions were underway. Congressional hearings were held. BOP's conduct fell under a spotlight.

That spotlight made it harder for BOP staff to destroy the evidence of Munagay's conduct—she lacked the foresight to attack JM off camera. So, after six months in solitary confinement, JM finally received an administrative hearing. And one look at the video surveillance showed that Munagay and every other officer had lied.

JM was exonerated. Munagay is currently being federally prosecuted. As for the rest, the sexual assault, conspiring and lying in official documents, BOP swept it under the rug.

As horrific as these events are, they are not unusual. JM is a survivor of USP Big Sandy, where the associate warden, lieutenants, and numerous guards systematically assaulted and tortured inmates, including JM, and destroyed inmates' efforts to file grievances. (The BOP staff are currently being federally prosecuted.) JM is a survivor of USP Thomson's infamous "Special Management Unit," which was shuttered just after JM left when a lengthy investigation revealed widespread crimes by BOP staff, who killed JM's cellmate.

Complaint                                – 4 –                                Connelly Law Offices
                                                                                321 W. 8th Avenue
                                                                                Spokane, Washington 99204
                                                                                253.593.5100

This Complaint details JM's saga—his path through USP Big Sandy to USP Thomson to USP Atwater to FCI Mendota—for two reasons. First, that history shows why JM's claims are "plausible."[1] Assaults, retaliation, and torture are everyday occurrences across the Federal Bureau of Prisons. And across all those facilities, BOP has erected an absurd "administrative process," the sole purpose of which is to insulate BOP from accountability by barring access to the courts. Second, this Complaint details JM's treatment because somebody has to. His treatment is intolerable in any civilized country claiming to uphold the rule of law.

This lawsuit seeks some semblance of justice for BOP's misconduct.

## I.   JURISDICTION AND VENUE

1.1     JM's claims can be loosely grouped into two categories: claims against the United States under the Federal Tort Claims Act (FTCA); and claims against individual defendants under the federal Constitution.

1.2     Under the first category, the FTCA provides subject matter jurisdiction for torts committed by federal employees, as described below.[2]

1.3     Under the second category, the Court holds federal-question jurisdiction because the claims arise under the federal Constitution.[3]

1.4     This Court holds personal jurisdiction and venue because the torts occurred at USP Atwater and FCI Mendota, both located in the Eastern District of California.[4]

1.5     As required by the FTCA, JM filed a tort notice on April 9, 2025:

---

[1] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss").

[2] *See* 28 U.S.C. §§ 1346(b)(1) (granting district courts "jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").

[3] *See* 28 U.S.C. § 1331(a).

[4] *See* 28 U.S.C. §§ 1391(b)(2), (e)(1) (venue lies where "substantial part" of events occurred), and § 1402(b) (tort claim against United States "may be prosecuted" where "the act or omission complained of occurred").

Complaint                                   – 5 –                    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Western Regional Office*
*7338 Shoreline Drive*
*Stockton, California 95219*

April 9, 2025

Connelly Law Offices, PPLC
Attorneys At Law
2301 North 30th Street
Tacoma, WA 98403

RECEIVED

APR 14 2025

CONNELLY LAW OFFICES, PLLC

RE:     Jahleel McLendon, Reg. No. 64953-050
        Administrative Claim No. TRT-WXR-2025-04808
        Received: April 7, 2025

Dear Mr. McLendon:

This is to acknowledge receipt of your Claim for Damage, Injury or Death (Standard Form 95) submitted or forwarded to this office under the provisions of the Federal Tort Claims Act (FTCA), 28

1.6     After receiving the tort notice, BOP made no effort to investigate, request additional information, discuss settlement, or provide any substantive response.

## II.    PARTIES

2.1     During the events described below, JM was in the care of BOP and housed at USP Atwater and FCI Mendota, both in the Eastern District of California.

2.2     The United States has waived sovereign immunity under the Federal Tort Claims Act. BOP is a "Federal agency" under the statute,[5] and thus liable for the claims described below. At all times, the BOP employees described below were investigative or law enforcement officers acting within the scope of their employment.

2.3     Defendants Atwater Does 1–2 were BOP staff at USP Atwater who assaulted and sexually assaulted JM in November 2023, and then denied him proper medical care. At the time, they were employees of the government under the FTCA. In this suit, claims are brought against Defendant John Does 1–2 in their individual capacities. Atwater Doe 1 is believed to be named "Mitchell" or something similar, and is the officer who sexually assaulted JM.

2.4     Defendants Mendota Does 1–5 were guards at FCI Mendota placed JM in restraints for lengthy periods between November 2023 and approximately April 2024, and then denied him proper medical care. At the time, they were employees of the government under the FTCA. In this suit, claims are brought against Mendota Does 1–5 in their individual capacities.

---

[5] *See* 28 U.S.C. § 2671.

Complaint                           – 6 –                    CONNELLY LAW OFFICES
                                                              321 W. 8th Avenue
                                                              Spokane, Washington 99204
                                                              253.593.5100

## III.  Facts

3.1     Although this suit arises from the assault and sexual assault by BOP guards at USP Atwater and the retaliation that followed at FCI Mendota, the facts start far earlier. Because JM must show the facts are plausible, and to help the Court understand BOP practices and administrative grievances, this Complaint covers JM's experiences from 2020 onward, which inform events at USP Atwater and after.

### A.      USP Big Sandy, Kentucky

3.2     JM grew up in New Jersey in conditions his presentence report calls "deplorable"—he and his siblings were repeatedly removed from their home because "[t]here was no running water and no food in the home," "feces w[ere] overflowing from the bathroom," there was "an infestation of insects that bit [social] workers upon entering," among other issues.

3.3     Over a three-week span in June 2012, at 18-years old, JM and an accomplice committed a series of armed carjackings that led to a 20-year federal sentence, which he is still serving.

3.4     In 2020, BOP held JM in one of the worst prisons in the country: USP Big Sandy in Inez, Kentucky.[6]

#### 1.      BOP's associate warden and guards institute an "unofficial policy" of torture and assault.

3.5     At USP Big Sandy, the associate warden, a captain, and numerous guards conspired to assault and torture inmates, JM included.

3.6     According to a plea agreement for BOP guard Terry Melvin, the associate warden at USP Big Sandy "instructed the lieutenants and senior staff" to prevent inmates from entering "protective custody" in the SHU.[7]

---

[6] In any criminal case, BOP classifies each criminal defendant according to a scoring sheet. According to the person's points (which depend on age, nature of the offense, length of sentence, criminal history, etc.), BOP assigns the person to one of five prison security-levels. Due to his youth, the length of his sentence, and his offense, BOP placed JM in a United States Penitentiary, commonly called a "USP."

[7] *U.S. v. Melvin*, No. 25-cr-1, Dkt. #10 at 2–3 (E.D. Ky. Jan. 24, 2025) (Plea Agreement).

Complaint                          – 7 –                    Connelly Law Offices
                                                           321 W. 8th Avenue
                                                           Spokane, Washington 99204
                                                           253.593.5100

3.7     The SHU was the one place inmates could seek safety. An inmate targeted by gangs or targeted for their offenses (e.g., a sex offender) or any other inmate facing violence could request to be placed in the SHU while "the potential threats against them were investigated."[8]

3.8     BOP staff didn't like that. So, if inmates insisted on protective custody, then USP Big Sandy "staff would illegally assault the inmates and falsely claim in paperwork that the inmate had assaulted them."[9]

3.9     The policy wasn't unique to USP Big Sandy. It was, as the associate warden "told the lieutenants," "also the unofficial policy in other institutions" where he had worked.[10] That is, the practice wasn't created at Big Sandy, it spread to Big Sandy.

3.10    Under the policy, BOP guards designated a weekly "staff assault day," in which they would tell "inmates 'stop resisting, stop resisting' during assaults, despite knowing that the inmate was not resisting."[11] These were *scheduled* constitutional violations.

3.11    These were not minor assaults. In one example, five BOP staff (the captain, two administrators, a lieutenant, and a guard) took an inmate, JB, "into the lieutenants' office, where there were no security cameras"—standard practice across BOP—"and pressed him against the wall" where they took turns beating the inmate. One lieutenant "punched JB in the face," then three others took turns "punch[ing] JB with a closed fist . . . in the stomach and face." When the inmate fell to the floor, a lieutenant "kicked JG in the stomach," all while a guard "repeatedly said 'stop resisting' as he watched the other lieutenants assault" the helpless man.[12] They then "stood JB up to take photographs," as one lieutenant said, "before his face swells up."[13]

3.12    It did not end with assault. BOP guards routinely strapped inmates into restraints for lengthy periods without food, water, or access to a toilet, forcing them to urinate and defecate on themselves. One inmate, a well-known, platinum-album-selling rapper named Bill Kapri (stage

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 3.
[12] *Id.* at 3–4.
[13] *Id.* at 5.

name: Kodak Black), filed a *pro se* complaint in August 2020, detailing his assault and torture. He was handcuffed, brought to a lieutenant's office (away from cameras), and then repeatedly punched in the face, sexually assaulted, and choked by a gang of BOP officers:[14]

> Wall." I replied "Okay Sir I just don't want to get sick thats all." With my face to the wall I suddenly felt an officer yank me by my dreads, Pull me backwards and Punch me in the face in one motion then multiple officers joined the ambush, striking me all over my body. One officer hit me with an object on my fore head and Lieutenant L. Moore sat and watched his guards act unprofessionally without stopping them. Instead, telling them to wait while he instruct them and call out combat moves* to try on me, Then they continue to Pounce on me some more using an excessive amount of force they knocked a tooth out of my mouth, choked me and beat me severely until Lieutenant L. Moore finally commanded them to Stop. Their was an inmate in the Lts office cage that witnessed them attack me for no reason while I was hand cuffed behind my back and on my knees named Timothy Wallace Register # 49864-054. While they were putting me in blue paper scrubs, off....

3.13    The officers then strapped him to a gurney, and when he "continued to gag, cough and throw up blood," an officer would "punch [him] in the face" and say, "no spitting on the gurney."[15]

3.14    He was placed in the SHU and "tied to a bed" for 16 hours, where he urinated and defecated on himself—

> "No spitting on the gurney". As if the gurney holds more than human life. They placed me in A-range Cell 101 where I was tied to a bed in 4 points for 16 hrs where I urinated 8 times and defacated twice on myself with no food and no face mask, lying in filth. When I was finally let out

— after which he was strapped to a restraint chair for hours more, without food at any point.[16]

---

[14] *See Kapri v. Federal Bureau of Prisons*, No. 20-cv-117-DLB, Dkt. #1 at 14 (E.D. Ky. Aug. 26, 2020).

[15] *Id.*, Dkt. #1 at 15.

[16] *Id.*

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.15   Another inmate, Arcelino Silva, also filed a *pro se* complaint explaining he had been "assaulted in the LT's office," like Mr. Kapri and others, and then "put in the SHU on false charges.[17]

3.16   In his complaint, he asked the district court to appoint counsel because "his legal documents were confiscated" by BOP staff to prevent him from filing a case, and he was placed in the SHU "at least (4) four times" because "he [had] been trying to exercise" his right to file a grievance "through the Administrative Remedy Process."[18] But BOP staff were using "extreme levels of retaliation" and "intimidation" to stop the grievance process and prevent "filing his complaint."[19]

3.17   They were successful. The Kentucky district court dismissed Mr. Silva's complaint because it was "not filed on a form approved for use by the Court," and refused to appoint counsel because the case was supposedly not complicated and "Silva has yet to even appropriately initiate the action.[20]

3.18   According to DOJ's later investigation, these assaults were "a commonplace occurrence."[21] JM witnessed them regularly.

**2.   BOP employees destroy evidence of the staff assaults.**

3.19   After assaults, BOP staff destroyed the incriminating evidence. They would destroy any "video evidence capturing officer misconduct"—indeed, BOP guards called it "staticking" the video ("i.e., turned to static"):[22]

---

[17] *See Silva v. Federal Bureau of Prisons*, No. 20-cv-110-WOB, Dkt. #1 (E.D. Ky. Aug. 6, 2020).
[18] *Id.*, Dkt. #1 at 4.
[19] *Id.*, Dkt. #1 at 4.
[20] *Id.*, Dkt. #4 at 1–2.
[21] *U.S. v. Melvin*, No. 25-cr-1, Dkt. #10 at 2 (E.D. Ky. Jan. 24, 2025) (Plea Agreement). *Id.* at 2.
[22] *U.S. v. Melvin*, No. 25-cr-1, Dkt. #10 at 3 (E.D. Ky. Jan. 24, 2025) (Plea Agreement).

Complaint                    – 10 –                    <span>CONNELLY LAW OFFICES</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

> (g) Captain M.D. and Associate Warden E.E. assigned members of the Special Investigations Section ("SIS") to help cover up acts of staff misconduct committed in furtherance of this conspiracy. The Defendant heard E.E. instruct someone in SIS on multiple occasions to "clean this shit up" and to "go squash" incidents involving unreasonable force by correctional staff. SIS members sometimes used the Defendant's office to interview inmates, and the Defendant heard one SIS employee ask inmates, "What's it going to take to make this go away?" On one occasion in the Defendant's office, the same SIS employee told the Defendant that he had "staticked" (i.e., turned to static) video evidence capturing officer misconduct by using a large speaker to distort the evidence. Following the assault of inmate C.T. by staff on April 29, 2021, the Defendant

3.20    BOP staff would then studiously falsify reports. They drafted "their written incident descriptions" to "make it look like inmates resisted or took actions that never actually happened," claiming inmates "became aggressive" and "struck staff . . . , none of which was true."[23]

3.21    Their reward for criminally attacking helpless inmates, destroying the evidence, and falsifying reports: "lieutenants received promotions" and "monetary rewards of approximately $6,000–$8,000."[24]

3.22    This was all done with involvement of SIS—the Special Investigations Section, the agency intended to investigate employee misconduct.[25]

3.23    JM was one of the victims.

### 3.    BOP guards assault and torture JM.

3.24    Over the course of 2020, JM was repeatedly "assaulted physically, verbally, and sexually" by "USP Big Sandy staff," as he wrote in a *pro se* letter to the Kentucky district court—a single-page note on a blank piece of paper asking for help.[26]

3.25    JM reported the assaults, but as is often the case in BOP custody, the people committing the assaults are also responsible for receiving complaints. BOP simply buried the complaints—refusing to allow JM access to the administrative-grievance forms and destroying

---

[23] *Id.* at 3–4.

[24] *Id.* at 4.

[25] *See Id.* at 3–5 (discussing involvement of "assigned members of the Special Investigation Section ('SIS') to help cover up acts of staff misconduct").

[26] *[JM] v. Fed. Bur. of Prisons*, No. 20-cv-148-DLB, Dkt. #1 at 1 (E.D. Ky. Nov. 25, 2020).

Complaint                           – 11 –                    Connelly Law Offices
                                                             321 W. 8th Avenue
                                                             Spokane, Washington 99204
                                                             253.593.5100

any he managed to submit. As JM wrote to the district court, "I've reported this on numerous occasions," but he was "targeted, retaliated and abused for trying to exhaust my remedies."[27]

3.26    Guards retaliated with force. JM was told, "if I keep filing these remedies that I won't ever leave USP Big Sandy"—they'd kill him.[28] On top of the beatings, he'd "been chained to a window, to a chair for 12 to 18 hours with no food water or bathroom":[29]

Case: 7:20-cv-00148-DLB    Doc #: 1    Filed: 11/25/20    Page: 1 of 1 - Page ID#: 1

NOV 2 5 2020    7:20·CV·148·DLS

Eastern District of Kentucky FILED NOV 2 5 2020

EASTERN DISTRICT COURT OF KENTUCKY (COURT CLERK)

AT LEXINGTON ROBERT R. CARR CLERK U.S. DISTRICT COURT

J____ M____ (#_____)

BIVENS CLAIM /PERMISSION to MOVE FORWARD with OUT REMEDIES

NOVEMBER 14TH 2020

* * *

REMEDIES. I AM ASKING to MOVE ON with the process of Filing A bivens claim, big sandy ADMinistrative Remedy coordinator tolk me If I keep filing these REMEDIES that I WONT EVER LEAVE USP big SANDy. IVe been subjected to corpral punishment For violating the disciplinary code. IVe been chained to A window, TO A chair FOR 12 to 18 hours with no FOOd WATER OR BATHroom

3.27    JM was left with "scars around both wrists" and asked the district court to "please respond as soon as possible my life is in danger."[30]

3.28    USP Big Sandy staff had little to worry about. Like the other complaints, the district court dismissed the complaint because JM didn't file the right forms (to which he had no access). As the court wrote, JM "did not file his submission on the Court's approved E.D. Ky. 520 Civil Right Complaint Form," or the Administrative Office's form 240, asking to proceed

[27] Id., Dkt. #1 at 1.
[28] Id., Dkt. #1 at 1.
[29] Id., Dkt. #1 at 1.
[30] Id., Dkt. #1 at 1.

Complaint                    – 12 –                    Connelly Law Offices
                                                        321 W. 8th Avenue
                                                        Spokane, Washington 99204
                                                        253.593.5100

without prepaying the $400 filing fee, and he failed to "hav[e] prison staff"—that same prison staff that tortured JM—"complete and sign the Certificate of Inmate Account Form."[31] The district court then mailed JM the forms.

3.29 The very idea that JM could file these forms was a fantasy. USP Big Sandy staff immediately learned JM had filed a complaint with the federal district court. Within weeks, intending to prevent JM from accessing the court and to separatie witnesses, BOP transferred JM to one of the most violent facilities in the country: the "Special Management Unit," at USP Thomson, Illinois.

**4.    DOJ successfully covers up the USP Big Sandy conspiracy.**

3.30 The torture, assaults, and cover up at USP Big Sandy would continue unabated. Indeed, the cover up was extensive. The United States went so far as to grant Mr. Kapri—Kodak Black—a commutation to keep attention off BOP's crimes.

3.31 Shortly after his *pro se* complaint was dismissed, Mr. Kapri contacted his former criminal attorney, Bradford Cohen, a formidable Florida lawyer with resources. Mr. Cohen filed a new civil complaint[32] against BOP detailing Mr. Kapri's assault and torture—a case that gathered national notice, including an article in Newsweek:[33]

---

[31] *Id.*, Dkt. #4 at 1–2.
[32] *See Kapri v. Fed. Bur. of Prisons*, No. 20-cv-2684, Dkt. #1 (D.D.C. Sept. 21, 2020).
[33] Jon Jackson, Newsweek, *Why is Kodak Black Suing the Federal Bureau of Prisons?* (Sept. 22, 2020).

Complaint                                     – 13 –                         CONNELLY LAW OFFICES
                                                                            321 W. 8th Avenue
                                                                            Spokane, Washington 99204
                                                                            253.593.5100

3.32    The United States did not like national attention on BOP staff's crimes. So, a few months after Mr. Kapri filed suit, his sentence was commuted.[34] On the very same day that Mr. Kapri walked free, January 20, 2021, the United States got what it wanted: Mr. Kapri's civil suit against BOP was voluntarily dismissed.[35]

3.33    The torture went on. With the Kentucky lawsuits dismissed because the inmates couldn't grieve the assaults or obtain the right forms, the USP Big Sandy guards continued torturing and assaulting victims without concern. It wasn't until more than a year later when the first group of USP Big Sandy guards were indicted:[36]

---

[34] *See* White House, *Statement from the Press Secretary Regarding Executive Grants of Clemency* (Jan. 20, 2021).

[35] *Kapri v. Fed. Bur. of Prisons*, No. 20-cv-2684, Dkt. #19 (D.D.C. Jan. 20, 2021) (Notice of Voluntary Dismissal).

[36] U.S. Dep't of Justice, *Three Big Sandy Employees Indicted for Civil Rights Violations* (May 27, 2022).

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

### B.    USP Thomson, Illinois

3.34    After filing his *pro se* complaint and being moved to USP Thomson, JM tried again to file administrative grievances. But he found the situation no different at USP Thomson—BOP staff routinely covered up each others' misconduct across facilities.

#### 1.    BOP staff bar JM from filing grievances.

3.35    Now sitting in a cell at USP Thomson, JM tried again to report the assaults at USP Big Sandy, but he was told "that I am not getting any BP forms on staff," as he wrote in a second letter to the district court:[37]

3.36    The simplest way to prevent JM from filing an administrative grievance form was to not give him an administrative grievance form.

---

[37] *Id.*, Dkt. #5 at 1 (letter from USP Thomson, Jan. 19, 2021).

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**2.    BOP staff retaliate against JM and kill his cellmate.**

3.37    In retaliation for JM's efforts to report the crimes, USP Thomson staff tried to incite violence. One common strategy: pairing enemies. USP Thomson guards would identify inmates who hated each other and then intentionally lock them in cells together, trying to incite violence and intimidate inmates, including JM.

3.38    Staff at USP Thomson made clear no reporting would be permitted and made examples of inmates. JM's cellmate was James Everett, an inmate who filed repeated grievances against officers for assault and extortion. In retaliation, the USP Thomson staff beat Everett repeatedly and four-point strapped him down for 2–3 days. On March 15, 2022, he was found dead, his wrists scarred from the shackles in what prisoners called the "Thomson tattoo."[38]

3.39    The message was clear: BOP staff would kill inmates who reported. They simply would not allow JM or anyone else to file grievances regarding the criminal assaults at USP Big Sandy or anywhere else.

3.40    Given those circumstances, JM's efforts in Kentucky were unsurprisingly unsuccessful. He tried to file the proper district court forms, but BOP staff removed them from his mailing.[39] Thus, the district court again dismissed his complaint for want of the local-rules complaint forms.[40]

3.41    From that experience, JM learned BOP staff could assault inmates with impunity, weaponize the grievance process, and prevent inmates from accessing the courts with ease.

3.42    JM's experience wasn't isolated. The abuse at USP Thomson drew the attention of the Washington Lawyers' Committee for Civil Rights, a non-profit group. The Committee, working with a major international law firm, Latham & Watkins, LLP, investigated conditions at USP Thomson, employing more than 40 lawyers to interview "more than 120 people."[41] The

---

[38] Christie Thompson, The Marshall Project, *How the Newest Federal Prison Became One of the Deadliest* (May 31, 2022).

[39] *See id.*, Dkt. #5 at 1 (noting "I've provided the documents I received").

[40] *Id.*, Dkt. #6.

[41] Washinton Lawyers' Comm., *Cruel & Unusual: An Investigation Into Prison Abuse at USP Thomson* (2023).

Complaint                                  – 16 –                        <span>Connelly Law Offices</span>
                                                                          321 W. 8th Avenue
                                                                          Spokane, Washington 99204
                                                                          253.593.5100

investigation revealed "a culture of torture far too pervasive to be the result of a few 'bad apples'"—no, it was "[m]ore than 165 staff members" who "participated in violence, abuse, or other inhumane treatment at Thomson."

3.43    The investigation revealed that BOP staff weaponized the "administrative process" to insulate themselves. The administrative grievance process was a fantasy, as the Latham & Watkins investigation confirmed: it was "virtually impossible to finish."[42] Staff could "easily interfere with the grievance process by simply refusing to provide or process the forms."[43] And if an inmate managed to file a grievance and receive a denial, "staff ripped up the forms (completed or not) inside the cells," halting any appeal and ensuring the inmate could not exhaust the (nonexistent) process.[44] It is that easy: if an inmate "does not attach the BOP's written responses" in their appeal, then BOP deems them to "have 'failed' to comply with the grievance process," and rejects the appeal entirely.[45]

3.44    As the report detailed, inmates were refused grievance forms ("I'm not giving you no more grievance forms"), guards "confiscated and destroyed" inmates' legal stamps and legal papers ("Officials likewise took every piece of documentation . . . including copies of appeals he had yet to mail to the Regional Office"), officials outright threatened inmates ("You must have forgotten what we do to n****rs around here. I'm gonna break your fucking hands since you like to write us up, motherfucker."):[46]

---

[42] *Id.* at 16.
[43] *Id.* at 16.
[44] *Id.* at 16.
[45] *See id.* at 16.
[46] *Id.* at 17.

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**Survivors**

When **D.L.** attempted to grieve one of many forced celling arrangements, his counselor took over a month to provide forms. During that time, the counselor would ask why D.L. wanted a form and what he was going to say in it.

When **A.S.** attempted to grieve an issue concerning his legal mail his counselor told him, "I'm not giving you no more grievance forms." When he attempted to file a grievance for more than one incident at a time, his counselor said, "You're issued one [grievance form] per policy." There is no such policy, and A.S. still does not know what happened

> "You must have forgotten what we do to n****rs around here.
>
> I'm gonna break your fucking hands since you like to write us up, motherfucker."

to his legal mail. Officials also confiscated and destroyed all A.S.'s stamps, legal papers, and family pictures. When he asked why, an official screamed in his face: "You must have forgotten what we do to n****rs around here."

I'm gonna break your fucking hands since you like to write us up, motherfucker." He then told A.S., ominously, "Filing grievances will get you in a lot of trouble."

Officials likewise took every piece of documentation **M.R.** kept in his cell pertaining to an excessive force grievance, including copies of appeals he had yet to mail to the Regional Office, causing him to miss his deadlines. No one has been held responsible for the underlying excessive force used against M.R.

When **D.T.** attempted to file a handwritten grievance for a violent assault after he was unable to obtain a prison-provided form for weeks, his counselor simply responded, "That's not how this works." No one has been held accountable for assaulting D.T.

When **H.D.** asked about the status of multiple grievances, the guards lied, telling him he never filed anything. He never received responses and was unable to complete the grievance process.

When **M.S.**, who is transgender, filed a handwritten grievance after officials refused to give her a prison-provided form, officials placed her in a cell with an openly anti-LGBTQIA+ cellmate, who beat her up. No one has been held accountable for the forced celling or assault because M.S. could not access the grievance process and was afraid.

3.45    Finally, in May 2022, despite BOP's best efforts to keep the crimes quiet, the misconduct at USP Thomson made national news.[47] Within a year, BOP was forced to shutter the Special Management Unit.

3.46    Although USP Thomson was closed due to widespread crimes by employees, not a single criminal prosecution or even *disciplinary* action was taken by BOP: "We are aware of no

---

[47] *See* The Marshall Project, *How the Newest Federal Prison Became One of the Deadliest* (May 31, 2022) ("The Marshall Project and NPR obtained federal prison data and agency documents, reviewed criminal and civil court cases, and interviewed dozens of people with knowledge of Thomson. In stories that echoed with the same visceral details, dozens of men said they lived under the pressing threat of violence from cellmates as well as brutality at the hands of staff.").

Complaint                    – 18 –                    Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

disciplinary actions or criminal charges against any" staff at USP Thomson, wrote the Washington Lawyers' Committee.[48]

3.47    Instead, BOP simply sent the officers guilty of horrific crimes to other federal prisons across the country. (One such officer from USP Thomson, Lieutenant Prince, would try to cover up JM's abuse at USP Atwater.)

3.48    JM's experience at USP Thomson was (just as it had been at every other BOP facility) that staff could commit worse offenses than the inmates, and the administrative grievance process was a fantasy.

### C.    USP Atwater, California

3.49    On July 17, 2023, JM arrived at USP Atwater. There, his problems started with a sunhat.

#### 1.    Officer Munagay attacks JM.

3.50    Although he had been at USP Atwater for months, it wasn't until the last week of October 2023 that JM's personal property finally arrived. In JM's property box was a BOP-approved straw sunhat he'd purchased (a necessity if one wanted to spend any time in the recreation yard in the California sun). One BOP guard, Sandra Munagay, did not like the sunhat.

3.51    On the morning of November 2, 2023, while JM was in the recreation yard, she approached JM and said, "give me that stupid hat." JM informed her that the acting lieutenant had specifically approved JM wearing it—he had, after all, purchased it through commissary.

3.52    She did not care: "give me that fucking hat," she instructed. JM did so.

3.53    Later in the day, JM returned to his unit and asked the new shift lieutenant[49] to return the hat. But Munagay and another officer, Rupe, were waiting.

3.54    Munagay: "that's my hat, you're not getting it back." JM understood that Munagay was simply bullying him and sought to remove himself from the situation. So he requested a confiscation form (which allows an officer to look up the receipt from the commissary

---

[48] *Id.* at 18.
[49] Believed to be named "Verna" or "Vernon."

Complaint                                    – 19 –                    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

and then return the hat) and asked the lieutenant to call the psychologist (which would allow JM to avoid Munagay).

3.55    In the afternoon, while JM was in his cell, Officer Rupe told him to come to the unit office for the confiscation form. JM followed the instruction, went to the unit office, and discussed the form with Officer Rupe, who was relatively new and didn't seem to understand the procedure. Eventually, JM said he would wait for the lieutenant and didn't want to sign the form. As JM was standing in the office door, Munagay approached and said, "are you gonna sign it or not?" After the interactions that morning, JM wanted to avoid Munagay's bullying and began walking back to his cell.

3.56    Munagay did not like that. She said, "mutherfucker, that's rude, don't you hear me talking to you?" She called him a few explicit terms, and he told her to leave him alone.

3.57    At that point, Munagay closed the gap between them and punched JM in the left side of his face. To be clear, JM wasn't threatening Munagay; he wasn't physically approaching her; he wasn't threatening her; he was not in any way provoking violence. Indeed, JM understood to avoid guards at all cost.

3.58    JM did not respond.

3.59    Officer Munagay then grabbed JM by the arm and began kicking his legs. Officer Rupe approached and told Officer Munagay to "get off" JM, who then pulled away and began walking towards his cell again.

3.60    As he was trying to disengage, Munagay instructed Rupe to help her and grabbed JM again as Rupe tried to trip him. JM remembers another inmate telling him to remain calm— they both know it would only get worse if JM fought back.

3.61    JM was then handcuffed and placed against "the bubble," a glassed-in enclosure. Munagay said, "we going to fuck you up," and pulled a can of pepper-spray and held it to JM's eye. Rupe told her to stop. Not because they were unlawfully assaulting an innocent inmate though; no, it would make a mess inside and be difficult to clean up.

Complaint                                    – 20 –                        Connelly Law Offices
                                                                          321 W. 8th Avenue
                                                                          Spokane, Washington 99204
                                                                          253.593.5100

3.62    The scuffle had been noticed, and a group of correctional officers were called to the unit. (JM assumes the control room pressed a distress button.)

3.63    At that point, Munagay knew she had a problem. So she lied, telling the responding officers that JM hit her.

### 2.    Officers violently assault JM by shoving a blunt object into his anus.

3.64    With that, the officers took JM, still handcuffed, into the hall to an area they knew was outside video surveillance.

3.65    The officers pinned JM into a wall. One, believed to be Officer "Mitchell,"[50] says, "oh, you're tough, you want to hit a female?" He took a blunt object, or possibly his hand, and violently shoved it into JM's anus through his shorts. Repeatedly—over and over again.

3.66    JM was left bleeding.

### 3.    BOP staff attempt to cover up the sexual assault.

3.67    The cover up started immediately. JM was taken to the medical unit, where Officer Mitchell and another officer, believed to be named "Cox," were present. Cox threatened him: "You wanna hit females. I'm going to tell your homies, and they're gonna beat you."

3.68    JM was seen by a BOP Nurse, Plascenia, and stated he had been sexually assaulted and wanted to see psychology (that is, the unit psychologist).

3.69    Plascenia started an exam. It wasn't real. She started saying that JM had no injuries and wasn't reporting any injuries—which was false. Indeed, that is what Plascenia recorded in the medical notes—"no significant findings" and "no apparent distress" and "no injuries were reported or found":

---

[50] JM was unsure of certain names, and those provided are as close as he can remember. One report notes an Officer "Mateaeu," which may have been mistaken as "Mitchell."

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| Inmate Name: M███████N, J█████ | | Reg #: 6██████ |
|---|---|---|
| Date of Birth: ██████ | Sex: M  Race: BLACK | Facility: ATW |
| Encounter Date: 11/02/2023 16:55 | Provider: Plasencia, A. EMT-P | Unit: Z01 |

**ASSESSMENT:**

No Significant Findings/No Apparent Distress

Inmate was assessed after being involved in an immediate use of force. Inmate was observed ambulating in no apparent distress w/ no obvious injuries. He was escorted to health services w/o further incidents. No injuries were reported or found during assessment. He stated being sexually abused but refused to give any additional information only stating wanting to talk to psychology. He was informed if any acute changes in condition are noted to contact medical staff and to follow up with sick call with any other complaint.

3.70    The sexual assault would have been buried right there, but after surviving USP Big Sandy and USP Thomson, JM knew the exams were recorded and began loudly saying he had been sexually assaulted—he wanted the accusation on camera. (JM knew it was common practice for guards to block the view of video recordings to ensure no injuries could be seen.)

3.71    In the room was a lieutenant, Davy, who intervened, saying the accusation had been recorded, and they needed to report it. That evening, JM was transported to FCI Mendota, a medium-security facility a little over an hour from USP Atwater:



Complaint                               – 22 –                    Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.72     Soon after arriving at FCI Mendota at approximately 9:30 p.m., November 2, 2023, JM was met in screening by a nurse, Noella Encizo. While being screened, the transport officer from Atwater, Lieutenant Prince, falsely told the nurse that JM needed no medical help and had already received a medical assessment—trying to prevent any further inquiry. (JM knew Lieutenant Prince from USP Thomson, where the deadly "special management unit" had been shuttered less than 12 months earlier.)

3.73     Hearing Lieutenant Prince's comments, Nurse Encizo started taking notes, saying JM was "refusing medical attention." JM interrupted her and said that was false—he had been sexually assaulted and demanded to meet with psychology.

3.74     At that point, the facility's psychologist, Brian McAleney, Psy.D., and SIS Officer Hellman,[51] stepped in and met with JM. He restated that he had been sexually assaulted by a guard, who "shoved something up my anus," although he was "not sure what the object was," and he requested a medical exam because "he believed he was bleeding":

**Bureau of Prisons**
**Psychology Services**
**Sexual Abuse Intervention (V)**          **\*\*SENSITIVE BUT UNCLASSIFIED\*\***

Inmate Name: M_____, J_____
Date of Birth: 10/24/1993          Sex: M          Facility: MEN          Reg #: _____
Date: 11/02/2023 21:55          Provider: McAleney, Brian PsyD/Chief          Unit Team: 1 GP

Alleged Perpetrator: BOP Staff

**Comments**

Date/Time of Reported Incident: 11/02/2023 at approximately 4:40PM
Date/Time Incident Reported to Staff: 11/02/2023 at approximately 9:35PM
Date/Time Psychology was Notified: 11/02/2023 at approximately 9:35PM
Date/Time Psychology Met with Inmate: 11/02/2023 at approximately 9:35PM

Subjective Information: On 11/02/2023 at approximately 9:35PM, during intake screening, inmate M_____ reported that he was the victim of sexual abuse. Per his self-report, on 11/02/2023 at approximately 4:40PM, inmate M_____ was sexually assaulted by a staff member who "shoved something up my anus." This abuse reportedly occurred on one occasion.

Inmate Interview: On 11/02/2023 at approximately 9:35PM, inmate M_____ was interviewed in a private area in R&D about the above complaint. During dialogue, inmate M_____ reported that on 11/02/2023 at approximately 4:40PM, he was released from his cell after "4:00pm count" and immediately confronted by an unnamed staff member (e.g., "big guy"). During interaction outside of his cell, the unnamed staff member reportedly asked inmate M_____ if he liked to assault staff and then the unnamed staff member proceeded to shove "something up" inmate M_____ "anus." Inmate MCLENDON added that he was not sure what the object was and that it was inserted into his anus "a couple of times." As a result of this assault, inmate M_____ reported that he believed he was bleeding and requested to have a medical examination.

[51] SIS is "Special Investigative Services."

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.75    Mr. McAleney's intervention was fateful. He notified SIS and health services and ensured a proper medical examination was done. (JM recalls him saying something to the transport officers and nurse to the effect of, "we know how they do it at the USP, but we don't do that here.") With Mr. McAleney's intervention, Nurse Encizo properly examined JM.

3.76    That medical exam directly contradicts the false medical report taken at USP Atwater by Nurse Plascenia. Indeed, the medical record from FCI Mendota reflects that JM stated he was "sexually assaulted," an officer's "fist penetrated his rectum," and the exam revealed "blood noted to at rectum"—clear physical evidence supporting the sexual assault:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Emergency Room | 11/02/2023 | 11/02/2023 | Urgent | No | English |

Subtype:
    Emergency Room
Reason for Request:
    Per I/M he was sexually assaulted: Fist penetrated his rectum a couple times.

Inmate Name:  M███████, J███████      Reg #: 64953-050
Date of Birth: ███████    Sex: M  Race: BLACK    Facility: MEN
Encounter Date: 11/02/2023 21:50    Provider: Encizo, Noelia RN    Unit: Z01

**Exam Comments**
Head to toe assessment completed r/t I/M stating he was sexually assaulted. Assessment completed with staff stand-by. The following injuries noted:
--2 small superficial scratches to L inner FA
--Superficial abrasion to R shin
--Tenderness and blood noted to at rectum.

3.77    After the assessment at FCI Mendota proved evidence of the assault, JM was sent to a local emergency room for a rape evaluation:

**ASSESSMENT:**
Other
Blood and tenderness noted to rectal area. VO received and carried out. I/M sent to local ER for further evaluation (SAFE/SANE).

3.78    Once at the hospital, the threats from guards resumed. One of the officers, Lieutenant Boston, pulled a sheet off JM and said, "oh, I see you got a lot to report . . . we know what you did." As JM began arguing with the officers, a nurse entered and saw the guards intimidating JM. He spoke with the nurse, and she called a sexual-assault advocate, Shelley, who spoke with JM and provided information about sexual assault resources.

3.79    BOP staff seized that information from JM.

**4.    BOP staff conspire to fabricate false incident reports and charge JM with assault and threats.**

3.80    While JM was undergoing a rape assessment an hour away, BOP staff at USP Atwater were busy fabricating false incident reports to administratively charge him. Munagay and the other guards used the same playbook seen at USP Big Sandy: claim the inmate was "aggressive." Munagay, supported by other guards, drafted an almost entirely make-believe report claiming JM became "aggressive," threatened to kill her, and "walked towards [her] in an aggressive way." She claimed that she "feared for [her] life due to his size and aggressive behavior." According to Munagay's report, she never punched JM. She "tried to place" her hand on "his shoulder" but "due to fearing for my life, I panic, and my hand landed on his left cheek." These were outright lies.

3.81    Munagay also fabricated threats, claiming JM "continued to threaten me by stating, 'I'll rape that fat pussy bitch,' more than several times":

The DHO reviewed the reporting officer's statement, which indicated, "This is a Re-Write. On November 2, 2023, at approximately 1634 hours in unit 5A, inmate M_____._____eg#64953-050, was advised to sign a confiscation form so his personal belongs could be mailed. Inmate then got **aggressive** and stated, " fuck you bitch" and walked out of the office. I S.Munagay give inmate a direct order to go inside his cell, Inmate M_____ J_____0 refused and started yelling in an **aggressive manner** " **I'll kill you fucken bitch**, I'll fuck your fat pussy, you fat bitch." As he walked towards me in an **aggressive way** I panic and **feared for my life** due to his size and **aggressive behavior**. I tried to place my right hand on his shoulder to gain distance from him on his shoulder, but **due to fearing for my life, I** panic, and my hand landed on his left cheek. I gave inmate M_____ J_____0 a direct order to put his hands behind his back, which he didn't comply and resisted to secure. **Inmate continued to threaten me by stating, "I'll rape that fat pussy bitch." more than several times.** Staff arrived and gave a direct order to cease his action, which he didn't comply and kept resisting by repeatedly pushing us away, with a close fist. Staff and I were able to put the inmate against the wall to have control, while still resisting I was able to put restrains on the inmate since staff was unable due to M_____J_____combative behavior. Inmate then was escorted by compound officers. Inmate M_____J_____050 was identified via bed book and Truscope."

3.82    Her statements were supported by the other guards. With that, JM was administratively charged with "threatening bodily harm" and "making sexual proposal / threat," among other charges:

| BP-A0304 | DISCIPLINE HEARING OFFICER REPORT | IR#: 3848779 |
| --- | --- | --- |
| | | Reg#: ██████ |
| Dept. of Justice / Federal Bureau of Prisons | | M████, J██ |

| Institution: ATWATER USP | Incident Report Number: 3848779 | |
| --- | --- | --- |
| NAME OF INMATE: M████, J██ | REG.NO.: 64953-050 | UNIT: 5A |
| Date of Incident Report: 11-02-2023 | Offense Code(s): 203A 206A 299A 307A | |
| Date of Incident: 11-02-2023 | | |

Summary of Charges:

203 – THREATENING BODILY HARM (Attempting). 307 – REFUSING TO OBEY AN ORDER (Aiding). 312 – BEING INSOLENT TO STAFF MEMBER (Aiding). 206 – MAKING SEXUAL PROPOSAL/THREAT (Aiding).

3.83    When BOP charged JM, there was video evidence proving Munagay's statements were false. But the guards were so sure of their own immunity, they weren't worried—the repercussions against BOP staff are virtually nonexistent. And they were right—nobody bothered watching the video before charging JM.

**D.    FCI Mendota, California**

**1.    BOP staff torture JM.**

3.84    After JM returned from the hospital to FCI Mendota, retribution started immediately. JM was placed in solitary confinement, the SHU, where BOP would keep him until he left the facility six months later.

3.85    Threats were constant. Throughout JM's time at FCI Mendota, BOP staff called him a "rapist," a "piece of shit"; he was told, "you going to get 30 years in prison," "we gonna make sure you get stabbed."

3.86    Guards directly pressured JM to withdraw his allegations. Munagay had previously worked at FCI Mendota, and BOP staff immediately retaliated against JM for reporting her misconduct. One guard, Officer Calhoun, tried to persuade JM to withdraw his complaint against her. JM recalls him trying to be chummy and saying, "She says she got three kids," and, "really, you gonna file a case on a female?"[52] When JM refused to withdraw his statements, Calhoun yelled down the range (i.e., the hallway in the SHU unit) that "[JM] is a rat," something he did repeatedly during JM's tenure at FCI Mendota.

---

[52] JM has no idea whether this was true.

3.87    Being labeled a "snitch" in BOP is a serious affair. Indeed, upon arriving at a BOP facility, particularly medium and high-security prisons, it is standard practice that inmates must show their presentence reports and case docket sheets to prove they are *not* cooperators. Here, Officer Calhoun's goal was to intimidate JM from proceeding with his allegations against Munagay and the other USP Atwater guards.

3.88    Lieutenant Boston would threaten JM directly: "we gonna fuck you up."

3.89    The abuse went beyond the merely verbal. BOP staff four-pointed JM for lengthy periods, 14-20 hours repeatedly, including periods exceeding 24 hours. JM was given no food. No water. No bathroom. He urinated and defecated in his clothes and was left in it.

3.90    To justify extended restraint, guards would falsify reasons, claiming JM was "aggressive" or struggling against the restraints.

3.91    Precisely the torturous practices JM describes have been acknowledged and criticized by the Department of Justice's Office of the Inspector General ("OIG"). In a recently released report, OIG wrote that the agency "receives numerous allegations every year" regarding abuse—indeed, "between August 2022 and August 2023," the Inspector General "received dozens of complaints involving abuse, injury, or other mistreatment of inmates in connection with the use of four-point restraints":[53]



*Left,* Hard Steel Arm and Leg Restraints and Soft Vinyl Cuff
*Middle,* Restraints Applied to Bed with Soft Vinyl Cuffs
*Right,* Cell and Restraint Bed Used when Inmate Held in Restraints
**Source:** OIG, September 2024

---

[53] Dep't of Justice, Off. of the Inspector General, *Notification of Concerns Regarding the Federal Bureau of Prisons' Policies Pertaining to the Use of Restraints on Inmates* at 5 (June 2025).

Complaint                    – 27 –                    <span>Connelly Law Offices</span>
                                                       321 W. 8th Avenue
                                                       Spokane, Washington 99204
                                                       253.593.5100

3.92    OIG's investigation revealed shocking abuse: "there were *thousands* of incidents of inmates held in restraints for 16 hours or longer, hundreds of which were held in restraints for more than 24 hours and some for over a week or weeks."[54] During those episodes, BOP staff would use the shackles to inflict life-long damage. OIG found complaints of "nerve damage or other long-term injuries due to the prolonged use of restraints"—"one inmate suffered long-term scarring" and "carpal tunnel syndrome" after he was "held in four-point restraints for over 3 days."[55] Another suffered irreparable nerve damage that required "amputation of part of the inmate's limb" after BOP guards held him in restraints "for over 2 days."[56]

3.93    OIG's investigation also found BOP staff used absurd grounds to justify lengthy four-pointing. Guards would drastically extend restraint periods because an inmate "was looking at the door or out the window, requesting to be released or asking when [he] would be released from restraints, pulling on the shoulder straps, or refusing to respond."[57]

3.94    OIG found that BOP staff used restraints to kill an inmate, strapping him "in restraints for successive periods of approximately 12, 30, and 29 days," until he was found "unresponsive"—dead.[58] BOP blamed his death on complications of sickle-cell disease.[59] (There are no indications any BOP staff were punished.)

3.95    For the most part, BOP staff use "manipulating or pulling on restraints as justifications for the continued use of restraints."[60] But any sane person would, of course, pull on restraints binding their limbs. At least, the OIG investigators thought so: "We found it unsurprising that a person who was restrained for hours or days . . . would experience frustration

---

[54] *Id.* at 7 (emphasis added).
[55] *Id.* at 7.
[56] *Id.* at 7.
[57] *Id.* at 8.
[58] *Id.* at 8–9.
[59] *Id.* at 9.
[60] *Id.* at 9.

leading to manipulating or pulling on the restraints."[61] If you're four-pointed to a concrete slab for an entire day, it's awfully difficult to not move a muscle.

3.96    These were precisely the strategies used to justify four-pointing JM.

**2.    BOP staff prevent JM from filing administrative grievances.**

3.97    Despite his previous experiences at Big Sandy and Thomson and knowing he would likely be subject to retribution, JM attempted to exhaust administrative remedies on his assault, etc., at USP Atwater and FCI Mendota. But as had always been JM's experience, BOP's administrative remedy process was illusory.

3.98    To understand how BOP undermined JM's ability to file administrative grievances, it is important to understand how the administrative-remedy process is supposed to work on paper.

3.99    In most cases, before an inmate is permitted to file a formal administrative grievance, BOP requires him to "first present an issue of concern informally to staff"[62] so that staff can "informally resolve the issue before an inmate submits a Request for Administrative Remedy."[63] (How staff are supposed to "remedy" a staff-on-inmate assault is anyone's guess.) The informal complaint, also referred to as a "cop out," is done on a BP-8 form.[64]

3.100    To file a formal administrative grievance, an inmate must use a BP-9 form, which contains a space for the inmate's request, a space for the warden's response, and must be filed within 20 days of the incident:

---

[61] *Id.* at 9.
[62] Bur. of Prisons, Policy No. 1330.18, *Administrative Remedy Program* § 542.13 (Jan. 6, 2014)
[63] *See* Bur. of Prisons, Policy No. 1330.18, *Administrative Remedy Program* § 542.13 (Jan. 6, 2014)
[64] BOP's policy is self-contradictory. Its regulations require that inmates "shall first" file the BP-8 informal-resolution form. But at the same time, the requirement to file the BP-8 "may not operate to limit inmate access to formal filing of a request." Yet that is exactly what happens in practice—staff refuse to allow a formal grievance unless the "informal" form was already filed. After all, the policy says "shall."

Complaint                                    – 29 –                    Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.101   After an inmate files a BP-9, the warden is supposed to respond, and then an inmate must appeal on a BP-10 form to the regional director, and then after another denial, must appeal to BOP's central office on a BP-11 form.[65]

3.102   Using the forms is mandatory: "The inmate *shall* obtain the appropriate form" from staff before filing:[66]

---

[65] *See* Bur. of Prisons, Policy No. 1330.18, *Administrative Remedy Program* § 542.14(c)(1) (Jan. 6, 2014).
[66] *See* 28 C.F.R. § 542.14(c)(1).

Complaint                                        – 30 –

3.103    Inmates must also file evidence. In progressing through the three levels, an inmate "must submit" a copy of "supporting exhibits" as evidence, and he must do so at *each* level.[67]

3.104    BOP ensures that is virtually impossible. At each level, BOP *keeps* the exhibits: "Exhibits will not be returned with the response."[68] And the demands increase at each level: BOP demands two additional copies for the regional appeal and three additional copies for the central-office appeal. Thus, an inmate needs at least *six* copies of all exhibits to survive the gauntlet (BP-9 = 1; BP-10 = 2; BP-11 = 3).

3.105    The absurdity continues by requiring the inmate to tell BOP what BOP just told the inmate. During each level of appeal, an inmate must file as an exhibit a copy of BOP's last response. So, an inmate must take BOP's response to his BP-9 and file it with his BP-10. Then, he must take BOP's response to his BP-9 and BOP's response to his BP-10 and file them with his BP-11 (along with his exhibits in triplicate). It's the bureaucratic version of Russian nesting dolls.[69]

3.106    Without copies of the last denial, BOP labels the inmate's appeal "defective" and rejects it: "failure to enclose the required single copy of lower level submissions" is a defect.[70]

3.107    Almost immediately after arriving at FCI Mendota, JM began attempting to file an administrative grievance.

3.108    JM's first problem was postage. If he mailed the BP-9 as regular mail, he would get no receipt. And, for regular mail, FCI Mendota required that envelopes remain open so that staff could review the contents before mailing. That process guaranteed JM's complaint would be destroyed by BOP mail staff. (Indeed, JM wrote his mother numerous letters reporting on his

---

[67] *See* 28 C.F.R. § 542.14(c)(3).

[68] *Id.*

[69] 28 U.S.C. § 542.15(b)(1) (appeals to regional director "shall be submitted" on the BP-10 and must include a copy of the "Request and response"; and the appeal to the central officer on the BP-11 must include *both* the "institution and regional filings and their responses").

[70] *See* Bur. of Prisons, Policy No. 1330.18, *Administrative Remedy Program* § 542.17(b)(2) (Jan. 6, 2014).

conditions at FCI Mendota and the events at USP Atwater. Not one arrived—all were destroyed by BOP staff.)

3.109   JM needed to send the BP-9 as certified legal mail, which allowed him to close the envelope in front of Officer Bacon, the guard who collected legal mail from the SHU. Officer Bacon would walk down the range (i.e., the SHU hallway), watch as inmates closed legal envelopes, collect them, mail them, and ensure receipts.

3.110   To send a grievance though, JM needed 7 stamps. (BOP's regulations state that an inmate "will be provided the postage stamps" for legal mailings or grievances,[71] but the warden "may impose restrictions."[72] In practice, that does not happen. And it did not happen here for JM—he needed postage. BOP's internal policies state an inmate may receive "five postage stamps" per week, but that requires "a final determination whether the inmate is to receive postage" from the "associate warden."[73] He was not being given them.)

3.111   Given those obstacles, JM began selling his food for stamps.

3.112   In the SHU, this required ingenuity. At each meal, JM would receive a plastic spoon. That spoon was wrapped in a thin-plastic baggie. At each meal, JM would save the plastic wrapper, twirl it into a thin line, and stretch it. After enough meals, he tied a series together to form a plastic rope of sorts. (This wasn't his invention. Others in the SHU used the same technique.)

3.113   With his makeshift line in hand, JM could tie food to his line—bags of potato chips, jelly, breakfast cakes—and cast it through the food slot in his cell door to other inmates, who would trade stamps in return.

3.114   In approximately late November or early December, JM obtained enough stamps and sent the BP-9, which was denied.

3.115   His next step was to appeal using a BP-10 to the regional director. To do that, he needed the BP-9 documents. That is where BOP guards stepped in.

---

[71] *See* 28 C.F.R. § 540.21(d).
[72] *Id.*
[73] Fed. Bur. of Prisons, *Program Statement 5265.14, Correspondence* § 540.21(d)(1) (Apr. 5, 2011).

Complaint                          – 32 –                    Connelly Law Offices
                                                            321 W. 8th Avenue
                                                            Spokane, Washington 99204
                                                            253.593.5100

3.116    At this point, BOP staff knew JM was trying to file an administrative grievance against one of their own. So, when JM was out of his SHU cell for a short period, an officer (believed to be Montoya or Montago) seized JM's personal property and legal paperwork—including the BP-9 forms JM needed.

3.117    When JM returned and found his property had been seized, he protested to the SHU officer, Lieutenant Garcia. At first, Garcia assured JM that his property would be found in his office. After a few days though, Garcia admitted to JM that his legal paperwork and other property had been destroyed.

3.118    With that, JM was forced to confront a fact: weeks of effort and suffering—creating a solitary-confinement fishing line, selling food, enduring threats and isolation—were for nothing. He spiraled into despair.

3.119    JM was trapped. He had been assaulted, isolated, trapped, and could not tell anyone who would listen. Indeed, by mid-January 2024, about 75 days after arriving at FCI Mendota, JM was expressing "suicidality" to the mental-health department because he could not "participate" in the "Administrative Remedy Process":

> 01.16.2024 (MEN): Inmate MCLENDON stated he expressed suicidality due to "perceived difficulties" participating in the Administrative Remedy Process and the Disciplinary Hearing Process. Expressed frustration with staff, denied suicidal intent or plans. Suicide watch was deemed not warranted.

3.120    This was a recurring issue. JM continued to "express frustration" about the "Admin remedy process":

> 01.23.2024 (MEN): Expressed suicidality to SHU LT to express frustration regarding DHO/Admin remedy process. Expressed frustration with staff, denied suicidal intent or plans. Suicide watch was deemed not warranted.

3.121    This went on for months. By March 2024, JM was still attempting to circumvent BOP staff's efforts to prevent him from exhausting administrative grievances:

> 03.20.2024 (MEN): Inmate MCLENDON expressed suicidal ideation because "wanted to see what was going on" with his previously filed administrative remedies. During contact he expressed his frustrations but denied suicidal intent or plans. Suicide watch was deemed not warranted.

3.122    Beyond refusing to provide forms and destroying JM's legal paperwork, BOP staff found other ways to bar grievances. Being held in solitary confinement for six months, JM has no

Complaint                                                  – 33 –                              CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

access to a copy machine, needed to preserve his filings and exhibits. But BOP staff either outright refused to make copies or claimed the copy machine was broken.

3.123    BOP staff ensured the administrative exhaustion process remained as illusory as it had been at USP Big Sandy and USP Thomson. It exists largely to insulate guards from accountability and protect BOP from lawsuits, ensuring inmates can be further abused without consequence.

### 3.    JM is exonerated of wrongdoing.

3.124    Throughout the months in solitary confinement at FCI Mendota, JM was facing administrative discipline for supposedly assaulting Officer Munagay—charges falsely supported by other officers. His disciplinary hearing was scheduled for April 2024.

3.125    JM was lucky in timing and location. In 2024, BOP was under extraordinary scrutiny for abusing inmates at a facility just two hours away, FCI Dublin. Two years earlier, the Associated Press had published a report detailing widespread sexual abuse at FCI Dublin, the primary West Coast federal women's prison.[74] Interviews with victims and staff revealed "years of sexual misconduct by predatory employees and cover-ups" by staff.[75] Hundreds of women were raped, sexually abused, and sexually harassed for *years* by everyone from the warden down.

3.126    Women had been filing complaints for "five years," but grievances were worthless: "The women say they were largely ignored, and the abuse continued."[76] One guard attempted to report her colleagues' misconduct in writing to BOP's Office of Internal Affairs for six years, "but was ignored" and then "retaliated against."[77] She was transferred out of FCI Dublin by BOP.

---

[74] Michael Balsamo & Michael Sisak, Associated Press, *AP investigation: Women's prison fostered culture of abuse* (Feb. 6, 2022).
[75] *Id.*
[76] *Id.*
[77] *See* CBS News, 60 Minutes, *Inside the Bureau of Prisons, a federal agency plagued by understaffing, abuse, disrepair* (June 16, 2024) (CBS Interview).

Complaint                                    – 34 –                         <span>Connelly Law Offices</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.127    By 2024, FCI Dublin was a national debacle for BOP's leadership. The attention generated congressional hearings. The warden was convicted.[78] The chaplain was convicted.[79] Numerous guards were convicted.[80]

3.128    Even then, two years into the fiasco, BOP had made little improvement and was under intense pressure. At that point, Judge Yvonne Gonzalez Rogers, overseeing the federal prosecutions and related civil suits,[81] was taking the abuse seriously in perhaps a way never seen from a federal court. In December 2023, as an evidentiary hearing approached, Judge Gonzalez Rogers learned that BOP staff were targeting victims and witnesses with "strip searches, cell searches and confiscation of legal papers," and BOP was "planning on transferring some of the[] witnesses to other facilities" to prevent their testimony.[82]

3.129    Judge Gonzalez Rogers was furious. She took the unprecedented step of an "unannounced visit" to FCI Dublin, where she personally interviewed "at least one hundred inmates."[83]

3.130    Even after her direct intervention, BOP failed to correct its practices. Judge Gonzalez Rogers labeled the facility "a dysfunctional mess" that "can no longer be tolerated," with administrators proceeding "sluggishly with intentional disregard for the inmates' constitutional rights" despite "being fully apprised" for years:[84]

[78] Dep't of Just., *Former Federal Prison Warden Sentenced for Sexual Abuse Of Three Female Inmates* (March 22, 2023).
[79] Dep't of Just., *Federal Prison Chaplain Sentenced for Sexual Assault and Lying to Federal Agents* (Aug. 31, 2022).
[80] Dep't of Just., *Ninth And Tenth FCI Dublin Correctional Officers Charged With Sexual Abuse Of Female Inmates* (June 26, 2025).
[81] The civil lawsuits would result in a $116 million settlement, and more suits are outstanding now. Nat'l Pub. Radio, U.S. to pay $116M settlement over rampant sexual abuse at Calif. women's prison (Dec. 17, 2024).
[82] *Calif. Coalition for Women Prisoners, et al. v. United States*, No. 23-cv-4155-YGR, Dkt. 222 at 2–3 (Mar. 15, 2024) (Order Granting Class Certification).
[83] *Id.* at 3.
[84] *Id.* at 1.

Complaint                    – 35 –                    <span>Connelly Law Offices</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

> CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL.,
>
> Plaintiffs,
>
> v.
>
> UNITED STATES, ET AL.,
>
> Defendants.
>
> Case No.: 4:23-cv-4155-YGR
>
> ORDER GRANTING THE MOTION FOR CLASS CERTIFICATION;
>
> GRANTING IN PART AND DENYING IN PART THE MOTION FOR PRELIMINARY INJUNCTION;
>
> GRANTING THE RELATED SEALING MOTIONS
>
> Re: Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209
>
> The Federal Correctional Institute ("FCI") Dublin is a dysfunctional mess. The situation can no longer be tolerated. The facility is in dire need of immediate change. Given the record presented and the Court's personal observations, further magnified by recent events, the Court finds the Bureau of Prison ("BOP") has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years. The repeated installation of BOP leadership who fail to grasp and address the situation strains credulity. The Court is compelled to intercede.

3.131    In March 2024, shortly after that order, the FBI *again* raided FCI Dublin, and the *new* warden was forced out.[85]

3.132    Overall, the Dublin affair highlighted BOP's absurdly broken reporting system and the lengths to which the agency would go to cover up staff-on-inmate abuse. As Judge Gonzalez Rogers learned, while hundreds of women were being sexually assaulted at just one facility, BOP was simultaneously trumpeting in its annual report to Congress that the prison system had *zero* substantiated incidents of staff-on-inmate abuse for the year—not one in the entire nation, a flawless track record:[86]

> VI.    **Staff-on-Inmate** Incident-Based Assessment: Data for this category is provided in aggregate form in the below table.  Staff incidents are received, assessed, and processed by the Office of Internal Affairs.  Thus, facility security-level is not noted, and only the year-end totals are provided in this report.  During CY2021, there were no substantiated cases in this category.

3.133    This was the backdrop as JM's hearing approached.

---

[85] Michael R. Sisak and Michael Balsamo, Associated Press, *Warden ousted as FBI again searches California federal women's prison plagued by sexual abuse* (March 11, 2024).

[86] Bur. of Prisons, *Annual PREA Report, Calendar Year 2021* (Mar. 30, 2022) (PREA Report).

CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

3.134    With special attention being paid to inmate abuse, BOP could not cover it up. At the hearing on April 26, 2024, despite retaliation and threats, JM "vehemently" contested the BOP guards' lies and demanded review of the unit surveillance cameras:

> B.    Summary of Inmate Statement:
> During the DHO hearing, inmate Mclendon vehemently denied the charge stating that a video review would have exculpatory information due to contradictory information as compared to the incident report.

3.135    JM was right. The video revealed Munagay and the other guards' reports were false, fabricated accounts designed to protect themselves and frame JM:

> On April 25, 2024, the DHO reviewed the CCTV video of the incident that occurred on November 02, 2023 at 1434. During the video review of the incident, the DHO found contradictory evidence which disputes the officers account of the incident written in Section 11 of incident report IRNO 3848779.

3.136    Absent the fortunate video surveillance, BOP staff would have yet again succeeded in assaulting an innocent inmate, falsifying charges and documents, and then punishing the inmate to cover up their own crimes.

3.137    With the fortunate video surveillance, JM was exonerated, found "NOT GUILTY," and the charge expunged:



> BP-A0304    DISCIPLINE HEARING OFFICER REPORT    IR#:  3848779
> Reg#: ▓
> Dept. of Justice / Federal Bureau of Prisons    M▓▓, J▓
>
> The DHO found M▓▓ J▓ reg▓▓, NOT GUILTY of the prohibited acts of (Attempting) Threatening Another with Bodily Harm, in violation of Code 203A, (Aiding) Sexual Proposal/Threat, in violation of code 206A, Refusing to Obey an Order, in violation of Code 307, Being Insolent to a Staff Member, in violation of code 312. All charges to include Codes 203A, 206A, 307, and 312 have been expunged.

**E.    Aftermath**

**1.    Officer Munagay is prosecuted.**

3.138    Six months after JM was exonerated, the U.S. Attorney's Office for the Eastern District of California indicted Officer Munagay for assaulting JM:

.. 

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

            Plaintiff,

         v.

SANDRA MUNAGAY,

            Defendant.

CASE NO. 1:24-cr-00256-NODJ-BAM

18 U.S.C. § 113(a)(4) – Assault by Striking (Count 1); 18 U.S.C. § 1519 – Obstruction of Justice—Falsification of Records in Federal Investigation (Count 2)

I N D I C T M E N T

COUNT ONE: [18 U.S.C. § 113(a)(4) – Assault by Striking]

    The Grand Jury charges THAT:

          SANDRA MUNAGAY,

defendant herein, on or about November 2, 2023, at United States Penitentiary, Atwater in Merced County, in the State and Eastern District of California, in the special maritime and territorial jurisdiction of the United States, did assault inmate J.M. by striking J.M.

3.139    The charge remains pending.

3.140    No charges against other BOP employees were filed for conspiring against JM, for sexual assault, or for the torture, threats, and retaliation that followed. BOP successfully ensured those crimes went unpunished.

**2.      BOP ignores JM's FOIA request.**

3.141    To prepare this suit, counsel obtained a DOJ form 361 for JM, a Certification of Identity—



**U.S Department of Justice**                    **Certification of Identity**

FORM APPROVED OMB NO. 1103-0016
EXPIRES 04/30/27

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The primary purpose for the collection of the information on this form is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. The authority by which information is collected on this form is 5 U.S.C. § 552 and 5 U.S.C. § 552a(a), as well as 28 CFR Section 16.41(d). Any information you provide may also be disclosed pursuant to a "routine use" under the Privacy Act of 1974, 5 U.S.C. § 552a, listed in a DOJ System of Records Notice, which may include: JUSTICE/DOJ-004 Freedom of Information Act, Privacy Act, and Mandatory Declassification Review Records (CMS) for the Department of Justice, available at https://www.justice.gov/opcl/doj-systems-records#DOJ. Your disclosure of information to the Department of Justice on this form is voluntary. If you do not complete all or some information fields in this form, however, the Department of Justice may not be able to effectively respond to your request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. § 1001 and/or 5 U.S.C. § 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC  20503.

Full Name of Requester [1] _____████████  ████████_____

Citizenship Status [2] __USA_____      Social Security Number [3] _____

Current Address __USP Coleman, PO Box 1033, Coleman, FL  33521_____

Date of Birth __10/24/1993_____      Place of Birth __Newark, NJ_____

3.142    With that in hand, on January 23, 2025, counsel filed a FOIA request for JM's BOP records—medical history, grievances, housing records, and other records useful in filing both a tort notice and a complaint. Ten months later, BOP has produced not a single record.

### 3.    **JM is left with profound damages.**

3.143    As a direct and proximate result of BOP employees' torts, JM suffered extraordinary physical pain and injuries.

3.144    JM also suffered profound psychological harm, including mental pain and suffering. He attempted to commit suicide multiple times due to the assaults, the emotional distress inflicted, and BOP's efforts to cover up its employees' crimes.

## IV.    Claims

4.1      The United States is liable under the FTCA for the operation of the Bureau of Prisons, its acts and omissions, including its supervision, training, policies, practices, and its employees (including their hiring, retention, discipline, training, supervision, and management).[87]

---

[87] For the FTCA claims listed below, JM does not at this time seek relief related directly related to the use of four-point restraints at FCI Mendota. He is filing a supplemental tort notice and intends to later amend this Complaint to add such claims relating to the use of restraints at FCI

Complaint                    – 39 –                    Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

4.2    At all times, the United States and BOP were responsible for operating the federal prisons, including USP Atwater and FCI Mendota and later facilities at which JM was held.

4.3    At all times discussed above, Munagay and all other BOP employees listed above were acting within the scope of their employment and under color of federal law as correctional officers, law enforcement officers, and federal employees within the meaning of 28 U.S.C. § 2680(h).[88]

**A.    First Claim: Assault and Battery**

4.4    Under the FTCA, the United States is liable for its employees' assaults and batteries against JM. *See* Calif. Civil Code § 1708.5.[89]

4.5    As described above, on November 2, 2023, Munagay and other BOP employees intended or with willful disregard for JM's rights caused harmful and offensive contacts with JM and caused imminent fear of harmful and offensive contacts with JM without lawful authority.

4.6    BOP's employees touched JM directly and indirectly in an offensive and harmful manner.

4.7    In the events described above, JM never consented to the touching or being placed in imminent fear of the harmful and offensive contact, and he was harmed and offended by the contact.

4.8    Under the FTCA, JM is entitled to recover damages from the United States.

**B.    Second Claim: Sexual Assault and Sexual Battery**

4.9    Under the FTCA, the United States is liable for its employees' sexual assaults and batteries against JM. *See* Calif. Civil Code § 1708.5.[90]

4.10    As described above, on November 2, 2023, BOP employees intended or with willful disregard for JM's rights caused harmful and offensive contacts with JM and caused imminent fear of harmful and offensive contacts with JM's anus without lawful authority.

---

Mendota.

[88] *See* 28 U.S.C. § 2680(h).

[89] *See* Calif. Civil J. Instr. § 1708.5.

[90] *See* Calif. Civil J. Instr. § 1708.5.

Complaint                              – 40 –                    Connelly Law Offices
                                                                321 W. 8th Avenue
                                                                Spokane, Washington 99204
                                                                253.593.5100

4.11    BOP's employees touched JM directly and indirectly in a sexually offensive and harmful manner.

4.12    In the events described above, JM never consented to the touching or being placed in imminent fear of the harmful and offensive contact, and he was harmed and offended by the contact.

4.13    Under the FTCA, JM is entitled to recover damages from the United States.

**C.    Third Claim: Intentional Infliction of Emotional Distress**

4.14    Under the FTCA, the United States is liable for its employees' intentional infliction of emotional distress against JM.[91] As described above, BOP employees intentionally or with reckless disregard engaged in conduct beyond all possible bounds of decency that any reasonable person would regard as intolerable in a civilized community.

4.15    As described above at length, BOP employees at USP Atwater and FCI Mendota abused their positions of authority over JM, including Munagay and other BOP employees to intentionally inflict emotional distress. But as the facts above make clear, other BOP employees intentionally inflicted emotional distress as well, including Nurse Plascenia, officers Prince, Boston, Calhoun, Montoya, and other officers who falsified official reports and threatened JM. The conduct was extreme and outrageous, beyond all bounds of civilized conduct.

4.16    Those BOP employees knew JM was vulnerable to emotional distress due to his position as an incarcerated person who was subject to administrative discipline, solitary confinement, loss of good-time credits, loss of First Step Act credits, loss of prison jobs, loss of property, loss of dignity, and other prison privileges.

4.17    BOP's employees intended that their conduct would cause severe mental distress and harm or acted with reckless disregard that their conduct would do so.

4.18    As described above, JM suffered extreme mental duress, including fear, anxiety, PTSD, suicidal ideation, despair, and other mental and physical harm.

4.19    Under the FTCA, JM is entitled to recover damages from the United States.

---

[91] This claim falls under California common law. *See* Calif. Civil J. Instr. § 1600.

**D.      Fourth Claim: False Imprisonment**

4.20    Under the FTCA, the United States is liable for false imprisonment of JM.[92] As described above, BOP officers at USP Atwater, acting within the scope of employment, wrongfully restrained, confined, and detained JM unlawfully and against his will by assaulting JM, placing him in handcuffs, threatening to pepper-spray his face, taking him outside into a hallway, pinning him to a wall and sexually assaulting him for a significant period of time.

4.21    The BOP employees intentionally deprived JM of his freedom of movement by threats and by force.

4.22    The BOP employees did not hold a lawful privilege to confine JM in the manner and for the purposes they did.

4.23    At no point did JM consent to the conduct.

4.24    As described above, JM was harmed by the confinement both physically and mentally.

4.25    Under the FTCA, JM is entitled to recover damages from the United States.

**E.      Fifth Claim: Sexual Harassment**

4.26    Under the FTCA, the United States is liable for its employees' sexual harassment of JM, all in violation of California Civil Code § 51.9. As described above, BOP held a special relationship with JM, controlling every aspect of his life. At the same time, BOP employees engaged in physical conduct of a sexual nature and a hostile nature, specifically, attempted to penetrate JM's anus with a fist or baton or other object as BOP employees forcibly held JM against a wall.

4.27    That conduct was based on JM's gender and was unwelcome, pervasive, and severe.

4.28    As a result, JM was personally injured, emotionally distressed, and was denied statutory and constitutional rights (as outlined above and below in this Complaint). He has and will continue to suffer economic loss resulting from the sexual harassment and resulting trauma.

---

[92] This claim falls under California common law. *See* Calif. Civil J. Instr. § 1400.

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

4.29    Under the FTCA, JM is entitled to recover damages from the United States.

**F.    Sixth Claim: Intentional Interference with Civil Rights by Threats, Intimidation, or Coercion**

4.30    Under the FTCA, the United States is liable for its employees' intentional interference with JM's civil rights by threats, intimidation, or coercion, all in violation of California Civil Code § 52.1.

4.31    As described above, BOP employees intentionally threatened, intimidated, and coerced JM for exercising both federal and state rights. BOP employees threatened, intimidated, and coerced JM from filing grievances under the Prison Litigation Reform Act ("PLRA"), which a plaintiff must exhaust before filing a civil suit, attempting to prevent JM from pursuing his civil rights under the FTCA and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). That is, BOP employees threatened, intimidated, and coerced JM for exercising and to prevent him from exercising his rights under those statutes. Additionally, BOP employees threatened, intimidated, and coerced JM for exercising and attempting to exercise rights secured by the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.* , and his rights under California law, including his general personal rights to protection from bodily restraint and harm under California Civil Code § 43, and his right to be free from sexual battery under California Civil Code § 1708.5.

4.32    JM reasonably believed that if he exercised his statutory civil rights, BOP employees would commit violence against him and his property.

4.33    That belief was reasonable given BOP employees in fact destroyed JM's property, including his legal paperwork and other property, and he was assaulted and sexually assaulted by BOP employees who possessed the apparent and actual ability to carry out their threats. JM was threatened, intimidated, and coerced to not report sexual battery, sexual harassment, or any other mistreatment at BOP employees' hands and was prevented from filing grievances and punished after doing so.

4.34    Under the FTCA, JM is entitled to recover damages from the United States.

Complaint                        – 43 –                    <span>Connelly Law Offices</span>
                                                            321 W. 8th Avenue
                                                            Spokane, Washington 99204
                                                            253.593.5100

**G.     Seventh Claim: Invasion of Privacy**

4.35     Under the FTCA, the United States is liable for its employees' invasion of privacy under California law.

4.36     Despite being held in prison, JM maintained a reasonable expectation of privacy in his own body. As described above, BOP employees intentionally intruded on his reasonable expectation of privacy in a manner that would be highly offensive to a reasonable person in the same position when they sexually abused and assaulted him.

4.37     In doing so, BOP employees sought to sexually humiliate and intimidate JM, and fulfill other illicit goals—none of which served valid penological purposes.

4.38     As a result, JM was physically and emotionally harmed.

4.39     Under the FTCA, JM is entitled to recover damages from the United States.

**H.     Eighth Claim: Negligence**

4.40     Under the FTCA, the United States is liable for its employees' negligence under California law.

4.41     As described above, Defendant owed a custodial duty to protect JM from foreseeable harm, including sexual abuse, harassment, retaliation, negligent infliction of emotional distress and the other harms identified in this Complaint. Defendant owed a general duty of care to JM to act as a reasonable person would under similar circumstances.

4.42     The duty is mandated by common law, federal law, by statute under PREA, and by numerous binding regulations and cannot be delegated.

4.43     As described above, BOP staff breached their duty of care by failing to supervise and operate USP Atwater and FCI Mendota, including by allowing assaults, sexual abuse, retaliation, and torture.

4.44     As described above, the United States and its employees knew or should have known JM was subjected to assault, sexual abuse, harassment, retaliation, torture, and emotional distress and failed to act.

4.45    Defendant possessed no discretion to ignore employees' criminal and tortious conduct.

4.46    A reasonable prison administrator would comply with PREA regulations.

4.47    A reasonable prison administrator must investigate all claims of sexual abuse and harassment.

4.48    A reasonable prison administrator must ensure that if incarcerated individuals report assault, sexual abuse, harassment, torture, and retaliation by prison staff, immediate investigation is mandated and protecting the incarcerated individual is mandated.

4.49    A reasonable prison administrator must ensure that incarcerated persons can confidentially report sexual abuse, harassment, and retaliation.

4.50    A reasonable prison administrator must ensure that staff committing sexual abuse, harassment, or retaliation are promptly disciplined.

4.51    If a prison official failed to comply with PREA regulations, it is foreseeable that incarcerated persons, like JM, would be assaulted, sexually abused, harassed, and retaliated against.

4.52    The United States is liable for its employees' negligent infliction of emotional distress against JM.

4.53    As described above, Defendant acted negligently, causing serious and severe emotional distress.

4.54    Defendant engaged in conduct beyond all possible bounds of decency that any reasonable person would regard as intolerable in a civilized community.

4.55    Defendant and other BOP employees described above abused their positions of authority over JM, all of whom had real or apparent power to affect JM's liberty, property, and other interests.

Complaint    – 45 –    <span>Connelly Law Offices</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

4.56    BOP's employees knew or should have known their conduct would cause severe mental distress and harm or acted with reckless disregard and negligence that their conduct would do so.

4.57    As a result of the conduct described above and to be further proven through discovery and at trial, JM suffered severe distress, anxiety, fear, humiliation, shame, depression, PTSD, loss of quality of life and dignity, and medical and economic injuries.

4.58    Under the FTCA, JM is entitled to recover damages from the United States.

**I.    Ninth Claim: Malicious Prosecution**

4.59    Under the FTCA, the United States is liable for its employees' conduct under California law, including for malicious prosecution.

4.60    As described above, BOP employees including but not limited to Munagay, Officer Rupe, and others falsified incident reports and initiated an intentionally false disciplinary proceeding against JM. The purpose of filing disciplinary charges against JM was to cover up their own misconduct, retaliate against JM for reporting their misconduct, and to indulge their own grotesque need to debase inmates, control others, and force JM into subservience.

4.61    As described above, BOP employees, all of whom were law enforcement officers, were actively involved in wrongfully bringing and continuing the administrative proceedings.

4.62    BOP employees understood no reasonable grounds existed to charge JM with assault, threats, or any other misconduct—no probable cause existed for the false charges. And no investigation was done when instituting those charges.

4.63    The proceeding ended in JM's favor with exoneration.

4.64    No reasonable person would have believed there were reasonable grounds to bring the proceeding against JM—indeed, BOP's employees understood there were no grounds whatsoever. BOP's employees knew the administrative charges were false when initiating the proceedings.

Complaint    – 46 –    <span style="font-variant:small-caps">Connelly Law Offices</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

4.65    As described above, BOP employees acted primarily for a purpose other than succeeding on the merits of the claim, namely covering up their own crimes and retaliating against JM, among other reasons.

4.66    As a direct and proximate result of the above, JM suffered immense harm. The existence of the administrative proceedings caused severe anxiety, anguish, and mental distress. The existence of the false administrative proceedings caused other BOP staff to target JM for retaliation, including four-pointing, threats, and other misconduct.

4.67    Under the FTCA, JM is entitled to recover damages from the United States.

**J.    Tenth Claim: Cruel and Unusual Punishment and Deliberate Indifference to Medical Treatment**

4.68    While the Constitution doesn't mandate "comfortable prisons, neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Inhumanity is precisely what Atwater Does 1-3 and Mendota Does 1–5 (together, the "individual Defendants") inflicted on JM, and they are liable for violating the Eighth Amendment under *Farmer* and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).[93]

4.69    As described above, the Atwater Does attempted to and did deny JM humane conditions of confinement and were deliberately indifferent to necessary medical treatment. After JM had been assaulted and sexually assaulted at USP Atwater, the Atwater Does stood in the medical room to intimidate JM and ensure JM received no actual medical examination. Indeed, BOP medical staff failed to provide any medical examination or treatment even as JM repeatedly stated he had been sexually assaulted because the Atwater Does (who had assaulted him) were present. BOP medical staff falsely indicated in medical reports that JM had no injuries. The purpose of denying JM medical treatment and the false reports was to cover up the assaults

---

[93] *See also Carlson v. Green*, 446 U.S. 14 (1980) (FTCA and *Bivens* exist as parallel claims); *Farmer v. Brennan*, 511 U.S. 825 (1994) (permitting claim against BOP officials for "a deliberately indifferent failure to protect petition's safety" from sexual assault).

by BOP staff, including the Atwater Does, and to inflict harm on JM. The Atwater Does will be identified through discovery.

4.70    Separately, as described above, the Mendota Does 1–5 attempt to and did deny JM humane conditions of confinement and were deliberately indifferent to necessary medical treatment. The Mendota Does intentionally and with deliberate indifference restrained JM without lawful cause, including four-pointing JM for lengthy periods without food, water, or a toilet, knowing JM needed medical care and denying it. The Mendota Does, with deliberate indifference, used shackles so tight as to cause pain, bleeding, and ultimately scarring on JM's skin, knowing JM needed medical care and denying it. The Mendota Does knew JM needed medical attention and relief from the inhumane conditions both because they witnessed his condition and because he requested it.

4.71    By assaulting and sexually abusing JM and by deliberately denying medical treatment, the individual Defendants knew JM had been or would be seriously harmed, or at the very least were aware of facts and actually inferred a substantial risk of serious harm. Despite their awareness, the individual Defendants actively caused harm and were deliberately indifferent to the harm.

4.72    As a result, JM suffered serious harm, including physical, psychological, emotional, financial, and reputational harm for which the individual Defendants are liable for damages.

## V.    Jury Demand

5.1    JM requests a jury trial on all triable issues.

## VI.    Relief Requested

JM respectfully requests the following relief: (1) an award of compensatory damages (both economic and noneconomic) against the United States in amounts to be proven and determined at trial; (2) other relief the Court deems proper or warranted by law.

Connelly Law Offices
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

Dated: October 30, 2025.

Law Office of Davina T. Chen

s/ Davina Chen
Davina T. Chen, Calif. Bar. No. 202272


Connelly Law Offices

s/Colin G. Prince
Colin G. Prince, Wash. Bar. No. 43166*
The Glover Mansion
321 W. 8th Avenue
Spokane, WA 99204
253.593.5100
*_Pro Hac Vice_ Application to Be Filed


s/John B. McEntire, IV
John B. McEntire, IV, Wash Bar. No. 39469*
The Glover Mansion
321 W. 8th Avenue
Spokane, WA 99204
253.593.5100
*_Pro Hac Vice_ Application to Be Filed

Complaint                     – 49 –                     CONNELLY LAW OFFICES
                                                         321 W. 8th Avenue
                                                         Spokane, Washington 99204
                                                         253.593.5100